154 N.J. Super. 282 (1977)
381 A.2d 364
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
NICHOLAS FENIN, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 15, 1977.
Decided December 6, 1977.
*284 Before Judges LYNCH, BISCHOFF and KOLE.
Mr. Roger W. Breslin, Jr., Bergen County Prosecutor, attorney for appellant (Ms. Sybil R. Moses, Assistant Prosecutor, on the brief).
Mr. Michael Gross, attorney for respondent.
PER CURIAM.
Leave having been granted, the State appeals from an order suppressing evidence which had been seized in defendant's apartment on January 23, 1976. As a result of the substantial amounts of controlled dangerous substances which were seized defendant was indicted for possession with intent to distribute, in violation of N.J.S.A. 24:21-19a(1), and possession, in violation of N.J.S.A. 24:21-20a(1).
The facts which follow have been derived from three sources: (1) a statement of facts made by defense counsel at the suppression hearing: (2) an affidavit prepared in support of an application for a search warrant, and (3) reports prepared by the arresting officers. Although the last two sources were not part of the evidence submitted at the hearing, the transcript reveals that the judge and the parties had the affidavit and reports before them. In any event, no testimony or other evidence was introduced at the hearing. See R. 3:5-7(c).
*285 On January 23, 1976 members of the Bergen County Narcotics Task Force arrested one Dominick Mancini for distribution of a controlled dangerous substance to a juvenile. Mancini wished to cooperate with the Task Force and stated that one month earlier he had purchased 15,000 T.H.C. (tetrahydrocannabinal) pills from Nicholas Fenin, 226 Lincoln Place, Garfield. He described Fenin's residence as the second-floor apartment of a two-story dwelling with aluminum siding and partial brick facing. He added that he had been in Fenin's apartment several times and had observed drugs and marijuana there. A police check of motor vehicle and telephone records revealed that a Nicholas Fenin did reside at that address. Also, Investigator Settembrino of the Task Force confirmed Mancini's description of Fenin's premises.
Mancini agreed to make a telephone call to Fenin and to have the call monitored by Task Force members. The interception was approved by the First Assistant Prosecutor of Bergen County Roger Breslin, acting for Prosecutor Woodcock in accordance with N.J.S.A. 2A:156A-4(c). At about 5:30 P.M. Mancini called Fenin and asked to purchase 5,000 T.H.C. tablets. Fenin replied that he did not have that quantity on hand but would "make some phone calls." He also reminded Mancini that he owed $1,800 on prior purchases.
After the call was completed the detective in charge of the investigation applied for a search warrant covering Fenin's apartment and sent a team of Task Force investigators to maintain a surveillance of the apartment. The surveillance team was instructed to arrest Fenin for conspiracy to distribute a controlled dangerous substance if he attempted to leave his apartment before the other investigators arrived with the search warrant.
At about 6:50 P.M. that evening Fenin left his residence and entered his car. Investigator Settembrino then approached and arrested Fenin, advising him of his Miranda rights. "At this time [the surveillance team] went into *286 Fenin's apartment to be sure no one was there and to secure the premises." After a "quick look around," the officers sat down with Fenin at his dining room table and awaited the warrant. The warrant had been signed by a judge at about 7 P.M. and the other Task Force members arrived with it at 7:20 P.M. After receiving the warrant the police conducted a search of the apartment, and several proscribed narcotics and drug paraphernalia were seized. It was this evidence that defendant successfully sought to suppress.
At the argument of defendant's motion to suppress, no testimony was offered. Rather, the parties presented legal argument on the validity of the wiretap, arrest and initial entry into the apartment. The State attempted to justify the entry by claiming that it was undertaken pursuant to a valid arrest and was warranted by exigent circumstances. After a brief hearing on February 14, 1977 the judge ordered a further hearing on February 24, 1977, in order to allow the State to show that it complied with N.J.S.A. 2A:156A-4 (c) in setting up the wiretap.
On February 24, 1977, after compliance with the Wiretapping and Electronic Surveillance Control Act was demonstrated, the judge requested arguments on the issue of probable cause to arrest. The State indicated that probable cause was established by the prior telephone call. Further, the State urged that the initial entry was incident to a valid arrest although it also claimed  rather briefly  that exigent circumstances existed as well.
In an oral opinion the judge suppressed the evidence. He found that Investigator Settembrino had no probable cause to arrest Fenin at the time because the "uncorroborated testimony" of Mancini did not display any "aura of trustworthiness" or reliability. Additionally, the judge found that the entry was not justified by any demonstrated exigency and was not otherwise justified as incident to the arrest.
On appeal the State seeks reversal of the order of suppression for the following reasons:
*287 (1) The court below erred when it denied the State's request to reopen and present testimony;
(2) Probable cause existed to arrest defendant for conspiracy to distribute a controlled dangerous substance;
(3) The warrantless entry by members of the Bergen County Narcotics Task Force into defendant's apartment was reasonable and should be held valid because exigent circumstances existed at that time.
For the reasons hereinafter stated we do not address any of the contentions now made by the State. We reverse simply because the evidence was obtained after the police had in their possession and presented to defendant a search warrant, the authority for which is not questioned. Even if it is assumed that the officers made an illegal entry into defendant's apartment and that they did not have probable cause to arrest him, there was no connection between the discovered evidence and such entry or arrest.
Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), in holding that the exclusionary rule is applicable to the states, stated the rule as follows: "* * * [A]ll evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court." Id. at 655, 81 S.Ct. at 1691 (emphasis added); see State v. Scanlon, 84 N.J. Super. 427, 433 (App. Div. 1964). Plainly, then, the exclusionary rule applies only to evidence "unconstitutionally seized." Mapp v. Ohio, supra at 658, 81 S.Ct. 1684. Moreover, the rule will operate to exclude items of evidence which are the "common tangible fruits" of an unconstitutional transgression of Fourth Amendment protections. Wong Sun v. United States, 371 U.S. 471, 485-486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
However, merely because the discovery of incriminating evidence was preceded by a violation of the Fourth Amendment, the evidence so uncovered does not thereby become "sacred and inaccessible." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). If, for example, the evidence was obtained *288 from an "independent source" and was not arrived at through the initial illegality, the evidence "may be proved like any others * * *." Id. at 392, 40 S.Ct. at 183. Similarly, if the connection between the discovered evidence and the initial illegality has "become so attenuated as to dissipate the taint * * *," the evidence should not be excluded. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). In Wong Sun v. United States, supra, the proposition was stated as follows:
We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). [371 U.S. at 487-488, 83 S.Ct. at 417]
Here, there was no rational connection whatsoever between the initial entry, assuming its constitutional infirmity, or defendant's arrest, and the search for and seizure of the evidence. Therefore, the discovery of the evidence was not the result of "exploitation" of a warrantless entry or illegal arrest.
The operation of this principle in New Jersey is demonstrated by the holding in State v. Parsons, 83 N.J. Super. 430 (App. Div. 1964). There, defendant had been convicted of breaking and entering, and he appealed, claiming, among other matters, that unlawfully seized evidence had been introduced at trial. Defendant had been arrested by police on January 13 and taken for arraignment on January 14. While on the way to the arraignment the police stopped at defendant's home and noticed a broken cellar step which apparently had some relevance to the crime charged. At the arraignment defendant was freed through exculpatory statements by a cohort. However, several days later another individual gave police several statements incriminating defendant *289 which they used to obtain a search warrant. The warrant was issued on January 19 and officers seized the cellar step which was introduced at trial.
On appeal, after holding that the initial arrest on January 13 was invalid, the court declared:
Finally, we comment on the search incidents on January 14 and 18, 1961. The observation of the broken cellar step on the 14th was unquestionably a fruit of the unlawful search and arrest on the 13th at Wrightstown since the officers were on their way to arraign defendant on the 14th. But this does not make the fact of the broken step "sacred and inaccessible." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Knowledge of this fact was gained from an "independent source," ibid., the lawful search under warrant on the 19th. [at 448]
Similarly, in State v. Mather, 147 N.J. Super. 522 (Law Div. 1977), a police officer stopped to investigate a car parked on the side of the road. Although nothing existed to establish probable cause, the officer entered the vehicle and retrieved identification papers from the glove compartment. Shortly thereafter, while investigating a local burglary, the officer discovered several stolen items near the vehicle. The vehicle was "staked out" and police stopped a car which passed the suspect vehicle very slowly. The identification papers seized earlier belonged to an individual in the stopped car and police arrested him and obtained a search warrant for his home and car. Both revealed incriminating evidence. The defendant moved to suppress the evidence under the "fruit of the poisonous tree" doctrine.
In denying the suppression motion, the court noted:
* * * even though evidence is derived from unconstitutional methods, it may still be admissible if it falls within the "independent source" or "attenuated connection" limitations to the "fruit of the poisonous tree" doctrine. [State v. Roccasecca, 130 N.J. Super. 585]. Id. at 594. There is also authority in other jurisdictions for an exception to the "fruit of the poisonous tree" doctrine where the court finds the evidence derived from information obtained in an *290 unlawful search would have been inevitably discovered through legal means regardless of the prior unlawful search. [at 526]
And further:
In this case it was neither the initial warrantless search nor the fruits of that search which caused the police to go to and commence an investigation of the burglary at the Dukes home but rather it was an independent source of information, the police radio report, which caused Smith to be dispatched for that purpose. He and others proceeded with an investigation of the crime and the investigation led them back to movant's vehicle. In contrast to the police activity in the Roccasecca case, supra, in this case Smith's initial search was not a warrantless search for evidence upon which to convict a man already suspected of a crime. In any event, the court is satisfied that in this case there was an independent source of information upon which to base the issuance of the warrants and, further, that the challenged evidence would have been inevitably discovered through legal means regardless of the initial warrantless search. Accordingly, the motion to suppress the evidence seized after movant's arrest pursuant to the three search warrants is denied. [at 528].
Cf. United States ex rel. Owens v. Twomley, 508 F.2d 858 (7 Cir.1974); see generally, Annotation: "Fruit of the Poisonous Tree," 43 A.L.R.3d 385.
In the case at bar, it is significant to note that none of the evidence subsequently seized was discovered upon the initial entry. Therefore, the fact pattern here presents an even stronger basis for admitting the evidence than that presented in State v. Parsons or State v. Mather, supra. The initial entry was not linked in any way to the grant of the search warrant and the discovery of the evidence. The evidence was seized pursuant to a valid search warrant. Thus, suppression of the evidence was unwarranted.
For the foregoing reasons the order suppressing the evidence seized at defendant's home on January 23, 1976 is reversed.